IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DAVID A. HAYES                              )
                                           )
                    Plaintiff,             )
                                           )
        v.                                 )  Civil Action No. 05-cv-01421
                                           )  Judge Paul L. Friedman
                                           )
UNITED STATES OF AMERICA,                  )
                                           )
                    Defendant.             )

PLAINTIFF'S RESPONSE TO DEFENDANT'S STATEMENT
OF ALLEGEDLY UNDISPUTED MATERIAL FACTS

        Plaintiff responds to Defendant's statement of allegedly undisputed facts as
follows:

1. On February 2, 2004, the Office of the Superintendent for the Rock Creek
   National Park, National Park Service ("NPS"), U.S. Department of the Interior,
   received a letter from plaintiff's mother, Barbara Hayes, regarding a bicycle
   accident involving her son on the Rock Creek Park Trail and complaining about
   the lack of warning signs. See Declaration of Adrienne Coleman, Superintendent
   of the Rock Creek National Park, NPS, U.S. Department of the Interior
   ("Coleman Decl."). Exhibit 1 and Exhibit 2, hereto, at ¶ 16.

RESPONSE: Agreed.

2. The gate was under the control and operated by the National Zoo. See Exhibit 5,
   hereto, Declaration of James F. Hilton, Safety and Occupational Health Manager
   for the National Zoological Park, Smithsonian Institution ("SI") ("Hilton Decl."), ¶
   2.

RESPONSE: Agreed.

3. The Superintendent for the Rock Creek National Park forwarded Ms. Hayes [sic]
   letter to the Smithsonian Institution as that agency oversees the Zoo and the
   subject gate. Exhibit 2 (Coleman Decl.) at ¶ 17 and Attachment 7.

RESPONSE: Agreed.

4. On November 5, 2004, plaintiff filed an [sic] Standard Form 95, Administrative
   Claim with the Smithsonian Institution for injuries he allegedly sustained on

December 25, 2003.  The basis for his claim as reflected on the Administration Claim form is:

> I was riding my bicycle on a trip going out on the Capital Crescent Trial [sic] and return via Rock Creek Park.  While on the Rock Creek Park trail, when I reached the National Zoo, I approached a tunnel, but the paved trail curved around the tunnel.  I followed the trail around the curve but there was a gate across the trail.  There were no markings or warning signs that the trail was blocked and, in my effort to stop before smashing into the gate, I hurtled over the front of my bicycle.  The only warning sign (stating that the gate is closed on Christmas and during inclement weather) was on the gate itself which is useless for biker [sic] riders who were coming around the curve toward the gate.  I sustained a complex fracture of my wrist, bruises on my face and head and scrapes.  I have incurred over $20,000 in medical, hospital and surgical expenses and have had pins, plates and screws installed in my right wrist and still have loss of function and heightened sensitivity (strong tingling sensation) in the wrist and believe these injuries may be permanent.

R.1, Exhibit A, <u>see also</u> Exhibit 3, hereto.

RESPONSE:  Agreed.

5. On April 26, 2005, the claim was denied by the SI. R.1, Exhibit B, <u>see</u> Exhibit 4, hereto.

RESPONSE:  Agreed.

6. On July 19, 2005, plaintiff filed the instant civil action, alleging that defendant was negligent in the following respects:
    a. Failure to inspect and maintain the property in a reasonable manner.
    b. Failure to post reasonable and adequate warning signs and other devices regarding the gate closing and its obstruction of the bicycle path.
    c. Failure to paint the gate or otherwise mark or alter the gate's appearance when closed, so as to adequately warn users of the bicycle path.
    d. Failure to include warnings on the bicycle path of the presence of the gate and its obstruction of the bicycle path, and
    e. Was otherwise negligent.

    R.1, Complaint at ¶ 12.

RESPONSE:  Agreed.

7. The NPS vests the superintendents and other decision-makers at the park level with the discretion to make decisions relating to public safety, including "decisions about whether to install warning signs or artificial light; distribute weather warnings or advisories;. . . close roads and trails, or install guardrails and fences. . ." Coleman Decl. at ¶ 9. "We [NPS decision-makers] balance the safety of park visitors, [with] the aesthetics of the surrounding areas, the potential for environmental impact or damage, the harmony of the park environment, and the available funds" when deciding what maintenance is performed and where and if signs are to be installed. Id. at ¶ 10.

RESPONSE:  The NPS may vest this discretion in its superintendents and other

decision-makers at the park level, but whether it does so without incurring exposure

to potential liability under the Federal Tort Claims Act for any negligence in the

exercise of the discretion is a legal issue to be decided by the courts, not a factual

dispute.

8. In deciding whether or not to place a warning sign, Ms. Coleman refers to the National Park Service Sign Manual as guidance and also takes into account such matters as "engineering judgment, the aesthetics of the physical surroundings of the area question, natural and historic features [and], the park visitors' enjoyment. . ." Id. at ¶ 11.

RESPONSE:  Ms. Coleman may aver that she refers to the NPS Sign Manual as

"guidance" and takes other matters into account in deciding whether to post a safety

sign, but whether the decision is shielded from liability under the FTCA is a legal

issue to be decided by the courts, not a right or privilege unilaterally determined by

the agency or its spokespersons.

9. The Sign Manual provides that "the individual park manager . . . has the responsibility for determining whether or not a sign is necessary or appropriate at a given location. . ." Id. at ¶ 12.  In sum, the NPS's policy is for the park manager to use his or her professional judgment "to intrude only minimally upon the natural or historic setting and to avoid a proliferation of signs. . ." Id.; see also ¶ 14.

RESPONSE:  Whether decisions by the individual park manager fall within the

discretionary function exemption to the government's liability under the FTCA is a

legal issue to be decided by the courts.

10. "The Rock Creek Park Trail [completed prior to 1980] is designed to abide by the
purpose of the [NPS]: . . . to conserve the scenery and the natural and historic
objects and the wild life therein and to provide for the enjoyment of the same in
such manner and by such means as will leave them unimpaired for the
enjoyment of future generations."  Coleman Decl. at ¶ 2 (*citing* 16 U.S.C. § 1);
see also ¶ 3.

RESPONSE:  This may be the NPS' obligation, but the NPS, itself, has described

the Rock Creek Park area involved in this case and Beach Drive, the major

thoroughfare traversing the park, as follows:

      1.     Beach Drive serves as the primary north-south route
through the northern portion of Rock Creek Park extending
approximately 6.46 miles from the Maryland state line at the Park's
northern boundary to its intersection with the Rock Creek and
Potomac Parkway just south of the National Zoo.

      2.     The Rock Creek and Potomac Parkway ("Parkway")
extends approximately 2.6 miles south from its intersection with
Calvert Street to its intersection with Ohio Drive and Parkway Drive
just south of the Theodore Roosevelt Bridge.

      3.     The Parkway is a limited-access facility that currently
serves as a primary urban commuter route within the District of
Columbia.

      4.     Approximately 235,000 visits per week are made to the
park by people driving through the park.

      5.     In addition to motorized recreation, Rock Creek and
Potomac Parkway and Beach Drive are also sources of non-
motorized recreation.  Beach Drive . . . is used by park visitors for
activities such as walking, in-line skating, and bicycling.  On
average, 40,000 people a week use Beach Drive for recreational
purposes.

      6.     Commuting has the greatest effect on traffic flows
through Rock Creek Park with the highest traffic levels

corresponding to the peak morning and evening commuting times. All lanes of the Rock Creek and Potomac Parkway are designated as one-way southbound during the morning commute period (6:45 A.M. to 9:30 A.M) and one-way northbound during the evening commute (3:45 P.M. to 6:30 P.M.) to accommodate individuals traveling to and from their work.

7.    Sections of Beach Drive and Rock Creek and Potomac Parkway carried from 5,200 to 25,000 vehicles and from 40,000 to 60,000 vehicles, respectively, during an average weekday.

8.    Daily traffic volumes varied very little during weekdays, when peak commuting conditions occur. Seasonal variations of traffic volumes in Rock Creek Park were very minor due to the high number of commuters using park roads, and the park's location within a large metropolitan community.

9.    A 1997 highway traffic safety study in Rock Creek Park . . . . stated that the safety problems on park roads were excessive vehicle speed and aggressive driving tendencies. The high vehicle speeds contributed to safety problems for bicyclists and pedestrians, as well as making it almost impossible for a visitor to have a comfortable driving experience in the park.

10.    Non-motorized recreation users are also a concern along Rock Creek Park and Potomac Parkway and Beach Drive. Conflicts between vehicles and bicycles or pedestrians are commonplace throughout the park and parkway. The park trail system crosses the park roadway system at numerous points, forcing interaction between different visitor uses. This situation is exacerbated in areas where there are no pedestrian or bicycle facilities available, forcing bicyclists to ride in the road and pedestrians to walk along the should of the road.

11.    The DDOT investigated and identified potential pedestrian and bicycle safety improvements on the Rock Creek Trail from P Street to Broad Branch Road and at the Zoo Tunnel. The purpose is to rehabilitate the trail and provide a safe route through the Zoo and eliminate users meeting on the Tunnel's narrow bridge sidewalk. A range of alternatives will be developed and evaluated to determine the feasibility of a trail bridge.

Declaration of David G. Dionne ("Dionne Decl."), Exhibit C hereto, ¶¶ 9 – 12, and

Exhibit D to the declaration:  Reconstruction and Rehabilitation of Beach Drive and

Rock Creek and Potomac Parkway from P Street to Calvert Street, Rock Creek

Park, Washington, D.C., Environmental Assessment and Assessment of Effect,

National Park Service, dated February 7, 2006, posted by NPS on 02/16/2006 at

http://parkplanning.nps.gov/document.  The declarations of Mr. Hayes (Declaration

of David A. Hayes, Exhibit B hereto ("Hayes Decl."), ¶ 4 and Exhibits B-1 through B-

41 to the declaration, and Mr. Dionne establish that the area involved in this case

hardly implicates the policy concerns described in the Coleman and Hilton

declarations.

11. The trail is a multi-use trail, meaning it was designed and is intended for the use
    of all park visitors, not just bicyclists. Id. at ¶ 4.  "Motor vehicle[s], including
    automobiles, motorbikes, and motorcycles are not permitted on the Trail.  Its use
    is limited to recreational activities." Id.

RESPONSE:  The trail is also used for bicycle commuters and in the area in

question sits immediately adjacent to a major commuter roadway handling up to

60,000 vehicles per day.  Dionne Decl., ¶¶ 9 – 12, and Exhibit D to the declaration.

12. The gate, upon which was posted the sign that plaintiff refers to in his complaint,
    is operated by the National Zoo, which is part of the Smithsonian Institution ("SI").
    See Exhibit 5, hereto, Hilton Decl., ¶ 2.  The gate is approximately 9 feet tall and
    10 feet wide.

RESPONSE:  Agreed, except the sign is not posted on the gate and is not a warning

sign.  Hayes Decl., ¶ 4(dd) and Exhibit B-30 thereto; Dionne Decl., ¶ 16 and Exhibit

E thereto.

13. The management of the National Zoo has full discretion as to what signs to post
    on the gate and on Zoo property generally. Id. at ¶¶ 4 and 5.

RESPONSE:  The National Zoo may vest this discretion in its management, but

whether it does so without incurring exposure to potential liability under the Federal

Tort Claims Act for any negligence in the exercise of the discretion is a legal issue to

be decided by the courts, not a factual dispute.

14. In exercising their discretion, zoo officials develop and post whatever signs they
    deem necessary to protect the public, the zoo, and its staff.  Zoo officials take
    into account various policy considerations, such as (a) the prevention of potential
    terrorist acts, (b) the safety of trail users, zoo visitors and employees, (c) the
    protection of zoo animals, buildings, and grounds from intruders, (d) the
    protection of the public from unsecured zoo animals, (e) the availability of funds,
    and (f) the aesthetics of the zoological park. Id. at ¶ 5.

RESPONSE:  Whether decisions by zoo officials in posting whatever signs they

deem necessary fall within the discretionary function exemption to the government's

liability under the FTCA is a legal issue to be decided by the courts.

15. The National Zoo has not adopted formal standards for sign placement.  Signs
    generally are approved by management-level employees, including the Safety
    Manager, the Deputy Director, the Zoo's Chief of Police, and the Director of the
    Friends of the National Zoo. Id. at ¶ 6.

RESPONSE:  The absence of formal standards is not relevant to the issue of

whether, under the facts of this case, the Zoo's decisions concerning the posting of

safety warnings for members of the public are exempt from FTCA liability as falling

within the discretionary function exemption.  That is a legal issue to be decided by

the courts.  The absence of standards, however, speaks directly to the negligence of

the Zoo, and this admission by defendant is certainly relevant proof as to its

negligence.

16. On the date of the accident and for several years prior to the accident, the gate in
    issue had a sign posted on it indicating the hours the zoo grounds are open and
    that the zoo is closed on December 25. Id. at ¶ 9.

RESPONSE:  Agreed, except the sign is not posted on the gate and is not a warning

sign.  Hayes Decl., ¶ 4(dd) and Exhibit B-30 thereto; Dionne Decl., ¶ 16 and Exhibit

E thereto.

17. On the day of the accident – December 25 – the zoo was closed and the zoo gates were closed. Id. at ¶ 8.

RESPONSE:  Agreed, but the Zoo failed to post any warning signs or to implement any other safety measures to advise members of the public that the Zoo had closed the gate across the multi-use pathway thus creating a dangerous obstruction or end-of-the-road condition requiring safety measures to be taken to protect trail users. Hayes Decl., ¶ ¶ 4 (and Exhibits thereto) - 10; Dionne Decl., ¶ 16 and Exhibit E thereto.

> Respectfully submitted,
>
> JACKSON & CAMPBELL, P.C.
>
>
> By: /s/ Nicholas S. McConnell
>     Nicholas S. McConnell (#167742)
>     1120 – 20th Street, NW (South Tower)
>     Washington, DC  20036-3437
>     (202) 457-1600
>     nmcconnell@jackscamp.com
>
> Attorney for Plaintiff David A. Hayes

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

DAVID A. HAYES,                          )
                                         )
                    Plaintiff,           )
                                         )
        v.                               )  Civil Action No. 05-01421 (PLF)
                                         )
                                         )
UNITED STATES OF AMERICA,                )
                                         )
                    Defendant.           )

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES
IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS OR,
IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

Defendant's motion to dismiss or, in the alternative, for summary judgment (Def.'s Motion) seeks to litigate an issue essentially resolved in plaintiff Hayes' favor in this circuit by Cope v. Scott, 45 F.3d 445 (D.C. Cir. 1995). This is the last case cited by defendant in its 18 page memorandum of points and authorities. For understandable reasons, defendant attempts to dismiss the case as controlling authority by purporting to discern a factual distinction between Beach Drive, the vehicle parkway involved in Cope, and the Rock Creek Park Trail, the multi-use pedestrian-bicycle commuter and recreational pathway immediately adjacent to Beach Drive involved in this case. It is a distinction without a difference.

All of the factors which led the court in Cope to conclude as a matter of law that the discretionary function exemption would not relieve the government of liability for its failure to warn users of Beach Drive of a dangerous condition apply with equal force to the Trail, certainly at the point where this incident occurred.

As <u>Cope</u> clearly controls on the facts in this case, defendant's effort to hide its negligence behind the discretionary function exemption should fail and its motion to dismiss or for summary judgment should be denied in its entirety.

     I.     <u>Facts</u>

Plaintiff brings this suit under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 2671 <u>et seq.</u>, for injuries sustained while he was on a bicycle ride during the afternoon of Christmas Day 2003 on the Rock Creek Park Trail ("Trail") near the National Zoo.  Complaint, ¶¶ 1-4; Deposition of David A. Hayes ("Pl.'s Depo."), taken April 4, 2006 (portions of which are attached as Exhibit A), p. 18, line 10 – p. 20, line 9.  At that location, the Trail, a high volume, inner city, multiuse pathway, Declaration of David G. Dionne ("Dionne Decl."), Exhibit C hereto, ¶¶ 9 – 12, is immediately adjacent to and parallels Beach Road which, itself, is a high volume, inner city commuter road way.  <u>Id</u>.  Plaintiff rounded a curve in the Trail at a point where a spur of the Trail splits off to go through a traffic tunnel while the main part of the Trail continues around the curve. Declaration of David A. Hayes ("Hayes Decl."), Exhibit B hereto, ¶ 4 and Exhibits B-1 through B-31 thereto; Pl.'s Depo, p. 18, line 13 – p. 19, line 21; p. 31, line 16 – p. 32,line 22.  Unbeknownst to plaintiff, and without any warning signs having been posted or other safety measures taken by defendant as to the dangerous condition it had created, Pl.'s Depo., p. 54, line 12 – p. 55, line 3, Hayes Decl., ¶¶ 5 - 8, defendant had blocked the Trail by pulling a chain link and barbed wire

fence gate across the entire Trail further along the curve.[1] Id. By the time plaintiff noticed the obstruction, he was forced to attempt an emergency stop and was thrown from the bicycle.  Hayes Decl., ¶ 8.

The injuries plaintiff sustained included a complex fracture of his right (dominant hand) wrist necessitating internal surgical fixation and rehabilitation therapy.  Hayes Decl., ¶ 10.  Plaintiff incurred over $20,000 in medical expenses and has sustained permanent loss of function and degenerative changes in the right wrist resulting in an AMA Guidelines rating of 15% permanent partial impairment of the use of his right upper extremity which corresponds to a 9% impairment of the whole person.  Id.

Following the bicycle accident on December 25, 2003, plaintiff's mother sent a letter, dated February 2, 2004, to the Office of the Superintendent for the Rock Creek National Park, National Park Service ("NPS"), U.S. Department of the Interior, notifying NPS of the accident and of the fact that a dangerous condition was created by blocking the pathway without posting any warning signs.  Coleman Decl., ¶ 16; Def.'s Motion, Exhibit 1.  Because the gate is the property of the National Zoo, NPS referred plaintiff's mother to the Smithsonian Institution ("SI") as the agency responsible for the Zoo.  Coleman Decl., ¶ 17. On November 5, 2004, plaintiff filed a Standard Form 95, Administrative Claim, with the SI for the injuries sustained on December 25, 2003.  Def.s' Memo, p. 2

---

[1] The gate is owned and controlled, and was closed, by the Smithsonian Institution ("SI").  Def.'s Motion, Exhibit 5, Declaration of James F. Hilton ("Hilton Decl."), ¶ 2.  The Trail leading up to the gate is owned and maintained by the National Park Service ("NPS").  Def.'s Motion, Exhibit Declaration of Adrienne Coleman ("Coleman Decl."), ¶2.

and Exhibit 4 thereto.  On April 26, 2005, the SI denied the claim, Def.'s Memo.,
Exhibit 4, and on July 19, 2005, plaintiff filed this action.

Defendant seeks dismissal or summary judgment on two grounds: (1)
failure to exhaust the administrative remedy as to plaintiff's claim that defendant
negligently failed to inspect and maintain the property, and (2) the "discretionary
function" exemption to the FTCA waiver of sovereign immunity as to all of
plaintiff's claims, including both negligent failure to inspect and maintain as well
as failure to warn.  Defendant misconstrues the nature of the "negligent failure to
inspect and maintain" claim which is part of its violation of the duty to warn under
the facts in this case, and the controlling case law in this jurisdiction trumps the
efforts of NPS Rock Creek Park Superintendent Adrienne Coleman and SI
Manager of Safety and Occupational Health James F. Hilton to declare
themselves the holders of unfettered discretion shielding the government from
liability for negligently failing to protect plaintiff from a dangerous condition the
government, itself, had created.

II.    Argument

    A.    Under the Cope case, defendant is subject to
        liability on the "failure to warn" claim

The larger issue is whether defendant is liable on the failure to warn claim,
which it clearly is, and that issue will be addressed first.  Plaintiff does not dispute
the holdings in a variety of cases that the discretionary function doctrine shields
the government from liability in deciding whether and, if so, how warning signs
are to be posted or other measures taken for public safety where essential
components of the decisional algorithm include preservation of places of great

natural beauty, scenic wonder, and historic significance, or the protection of

wildlife and plant species.  As correctly noted in defendant's memorandum, these

cases[2] recognize that decisions made under those circumstances necessarily

implicate the governmental policy considerations protected under the

discretionary function exemption from FTCA liability.  Def.'s Memorandum, pp. 16

– 18.

It is undoubtedly for this reason that the declarations submitted by

Superintendent Coleman and Manager Hilton are replete with references to the

need to take into consideration a variety of policy related factors reasonably

_____

[2] The cases defendant cites to support application of the "discretionary function" exemption to its failure to post a warning sign on a highly trafficked multi-use path immediately adjacent to a commuter thoroughfare in the middle of a high-traffic metropolitan area include:  Rosebush v. United States, 119 F.3d 438 (6th Cir. 1997) (no governmental liability for failure to place protective railings around a fire pit at a lakeside campground in Hiawatha National Forest in the Upper Peninsula, Michigan); Clark v. United States, 898 F.2d 156 (Table), 1990 WL 31563 (9th Cir. 1990), cert. denied, 499 U.S. 946 (1991) (no governmental liability for failure to post flash flood warning signs near Tanque Verde Falls in the Coronado National Forest, Arizona); Bowman v. United States, 820 F.2d 1393 (4th Cir. 1987) (no governmental liability for failure to place a guard rail along the Blue Ridge Parkway described by the court as "[a]n unusual highway in that its primary purpose is not to facilitate transportation and travel . . . [but] to allow the public access to scenic recreational and wilderness areas"); Soldano v. United States, 453 F.3d 1140 (9th Cir. 2006) (no governmental liability for failing to post signs on roadway in Yosemite National Park warning of possible stopped vehicles in roadway); Valdez v. United States, 56 F.3d 1177 (9th Cir. 1995) (no governmental liability for failing to post warning signs or take other safety measures to prevent injury to park visitor who fell into the 90 foot waterfall at Ella Falls in Kings Canyon National Park); Childers v. United States, 40 F.3d 973 (9th Cir. 1994) (no governmental liability for decision to leave portion of trail in Yellowstone National Park open during winter and not to post warning signs); Fahl v. United States, 792. F. Supp. 80 (D. Ariz. 1992) (no governmental liability for failure to post warning signs or guard rails on the South Rim of the Grand Canyon); Blackburn v. United States, 100 F.3d 1426 (9th Cir. 1996) (no governmental liability for alleged negligent failure to take steps – in addition to

5

invoked in deciding whether and, if so, how to post warning signs to protect

visitors in Hiawatha National Forest, Coronado National Forest, the Blue Ridge

Parkway, Yosemite National Park, Kings Canyon National Park, Yellowstone

National Park, and the Grand Canyon.

The venue involved in this case, however, has been described by the

National Park Service, as having the following characteristics:[3]

1.    Beach Drive serves as the primary north-south route through the northern portion of Rock Creek Park extending approximately 6.46 miles from the Maryland state line at the Park's northern boundary to its intersection with the Rock Creek and Potomac Parkway just south of the National Zoo.

2.    The Rock Creek and Potomac Parkway ("Parkway") extends approximately 2.6 miles south from its intersection with Calvert Street to its intersection with Ohio Drive and Parkway Drive just south of the Theodore Roosevelt Bridge.

3.    The Parkway is a limited-access facility that currently serves as a primary urban commuter route within the District of Columbia.

4.    Approximately 235,000 visits per week are made to the park by people driving through the park.

5.    In addition to motorized recreation, Rock Creek and Potomac Parkway and Beach Drive are also sources of non-motorized recreation. Beach Drive . . . is used by park visitors for activities such as walking, in-line skating, and bicycling. On average, 40,000 people a week use Beach Drive for recreational purposes.

---

posting warning signs – to prevent injury to park visitors from diving off the Stoneman Bridge in Yosemite National Park).

[3] These statements are contained in RECONSTRUCTION AND REHABILITATION OF BEACH DRIVE AND ROCK CREEK AND POTOMAC PARKWAY FROM P STREET TO CALVERT STREET, ROCK CREEK PARK, WASHINGTON, D.C., ENVIRONMENTAL ASSESSMENT AND ASSESSMENT OF EFFECT, National Park Service, dated February 7, 2006. The document was posted by NPS on 02/16/2006 at http://parkplanning.nps.gov/document. A copy of relevant portions of the document are attached as Exhibit D to the declaration of David G. Dionne, Exhibit C hereto.

6.    Commuting has the greatest effect on traffic flows through Rock Creek Park with the highest traffic levels corresponding to the peak morning and evening commuting times.  All lanes of the Rock Creek and Potomac Parkway are designated as one-way southbound during the morning commute period (6:45 A.M. to 9:30 A.M) and one-way northbound during the evening commute (3:45 P.M. to 6:30 P.M.) to accommodate individuals traveling to and from their work.

7.    Sections of Beach Drive and Rock Creek and Potomac Parkway carried from 5,200 to 25,000 vehicles and from 40,000 to 60,000 vehicles, respectively, during an average weekday.

8.    Daily traffic volumes varied very little during weekdays, when peak commuting conditions occur.  Seasonal variations of traffic volumes in Rock Creek Park were very minor due to the high number of commuters using park roads, and the park's location within a large metropolitan community.

9.    A 1997 highway traffic safety study in Rock Creek Park . . . . stated that the safety problems on park roads were excessive vehicle speed and aggressive driving tendencies.  The high vehicle speeds contributed to safety problems for bicyclists and pedestrians, as well as making it almost impossible for a visitor to have a comfortable driving experience in the park.

10.    Non-motorized recreation users are also a concern along Rock Creek Park and Potomac Parkway and Beach Drive.  Conflicts between vehicles and bicycles or pedestrians are commonplace throughout the park and parkway.  The park trail system crosses the park roadway system at numerous points, forcing interaction between different visitor uses.  This situation is exacerbated in areas where there are no pedestrian or bicycle facilities available, forcing bicyclists to ride in the road and pedestrians to walk along the should of the road.

11.    The DDOT investigated and identified potential pedestrian and bicycle safety improvements on the Rock Creek Trail from P Street to Broad Branch Road and at the Zoo Tunnel.  The purpose is to rehabilitate the trail and provide a safe route through the Zoo and eliminate users meeting on the Tunnel's narrow bridge sidewalk.  A range of alternatives will be developed and evaluated to determine the feasibility of a trail bridge.

The declarations of Mr. Hayes and Mr. Dionne establish that the area

involved in this case hardly implicates the policy concerns described in the

7

Coleman and Hilton declarations. Ms. Coleman states that in deciding whether and how to place signs in the area she takes into account the "aesthetics of the physical surroundings . . . [ and] natural and historic features . . . ." Coleman Decl., ¶ 11  The NPS's own description of the area belies this as a factor in posting safety signs in a commuter traffic corridor, and this is corroborated by the photographs attached to Mr. Hayes' declaration. Although Ms. Coleman says she takes "engineering judgment" into account, Coleman Decl., ¶ 11, there is no reference in her declaration to any engineering study that has actually been performed with respect to placement of signs for the safety of trail users at this site.[4] And while Ms. Coleman also says she has to take into account the "long standing National Park Service policy to intrude only minimally upon the natural or historic setting and to avoid a proliferation of signs," Coleman Decl., ¶ 14, that statement is hard to square with all the signs and the haphazardly maintained public announcement billboard shown by photographs to exist in the area. On the other hand, the one place in the area where a sign should be erected to warn path users when the pathway is blocked by a locked gate is shown in the photographs not to have any signs nearby – "proliferation" of signs at the precise point where one is needed is a false concern.

The declaration of Mr. Hilton is no more helpful to defendant. While claiming that the Zoo has "full discretion" as to what signs to post – presumably usurping the court's authority to decide as a matter of law whether that is so –

_____

[4] Plaintiff's expert has testified that the need for the sign is so obvious that the reference to engineering studies is not applicable. Dionne Decl., ¶ 16, Exhibit E, p. 202, line 16 – p. 204, line 19.

8

Mr. Hilton states that the "policy considerations" the zoo officials take into account in deciding whether and how to post signs include the prevention of terrorist acts, the safety of trail users, the protection of zoo animals and property from intruders, the protection of the public from unsecured zoo animals, the availability of funds and the aesthetics of the zoo park.  Hilton Decl., ¶ 5.  But there is no discernible connection between terrorists and the necessity to post a trail use warning sign.  The same is true of the need to protect zoo animals (they would hardly be threatened by a sign on the trail) or the need to protect the public from "unsecured zoo animals" unless posting a sign would somehow unlock the animal cages.  And while Mr. Hilton says the gate in question must be closed and locked to secure the zoo grounds, Hilton Decl., ¶ 7, as of December 2003, there was no sign warning users of the trail that they were about to leave the NPS trail and enter zoo grounds which were closed to the public for Christmas.

The suggestion that the fact that the entrance gate to the zoo off Beach Drive served as a warning to users of the trail that the trail ahead was closed, Coleman Decl., ¶ 10, is totally misleading.  The gate blocking the zoo entrance actually parallels the trail[5] and does not serve as any warning that the trail ahead is obstructed.  To the contrary, the fact that the gate to the zoo is closed but the trail's status at that point is unaffected would more likely imply to a reasonable person riding along on a bicycle that the zoo's closure has no impact on the trail's availability.  Equally misleading is the suggestion in the Coleman declaration that there were two signs warning people that on December 25 the gate would be

closed across the trail, one posted on the gate itself,[6] another posted at the gate

blocking the entrance to the Zoo from Beach Drive.  Coleman Decl., ¶¶ 9 – 10.

These signs were not warning signs.  They were small signs with small print

(about one inch high) readable from a distance of perhaps four to five feet

functioning as information signs for passersby walking up to the closed gates and

perhaps curious as to the gate closure, not warning signs to bicyclists about to

encounter the obstructed trail.  Dionne Decl., ¶ 16, Exhibit E, p. 199, line 16 – p.

200, line 16; Hayes Decl., ¶  4(g) and Exhibit B-7, ¶ 4(h) and Exhibit B-8, ¶ 4(o)

and Exhibit B-15, ¶ 4(dd) and Exhibit B-30, and ¶ 4(ee) and Exhibit B-31.

        The defendant's effort to declare its way out of liability fails in light of <u>Cope</u>

<u>v. United States</u>, <u>supra</u>.  There the government also argued that the discretionary

function exemption shielded it from liability for failing to post a warning sign on

Beach Drive concerning the dangerous slippery condition of the roadway.  The

Circuit Court of Appeals dispatched the argument noting that the "engineering

considerations" cited by the government did not involve the public policy

considerations protected by the exemption and that the government's stated

desire "to maintain the park in as pristine a state as possible" failed to

demonstrate how the desire affected placement of traffic safety signs on the

roadway.  <u>Cope v. United States</u>, <u>supra</u>, 45 F.3d at 451 – 52.  Given the number

of traffic control, warning and informational signs in the area on a stretch of road

---

[5] This area is shown in the photographs attached to the Hayes Declaration, ¶ 4, as Exhibits B-1 through B-3.

[6] As a slight factual discrepancy, this sign is not actually on the gate but on the fence adjacent to the gate.  Hayes Decl., ¶ 4(dd) and Exhibit B-30.  As noted in

that carried 20,000 vehicles daily, the court concluded that the Park Service had

chosen to manage the roadway as a commuter corridor, not a pristine park area,

so that it could not successfully invoke public policy "discretionary"

considerations as a defense to its failure to post warning signs. Id. at 452.  The

court thus readily distinguished the pristine park cases, including the Bowman[7]

case which the government invokes again in these proceedings, from the facts

presented by the Rock Creek Park – Beach Drive setting.

    The evidence in this record establishes that the Rock Creek Trail is

virtually indistinguishable from Beach Drive as vehicle – pedestrian – bicycle –

multiuse thoroughfares at the point where this incident occurred.  In fact the two

run parallel to each other separated by a matter of a few feet throughout the

area, and the trail is actually funneled into the same tunnel as Beach Drive during

times when defendant decides to close the gate in question.  The same type and

number of traffic control, safety and informational signs posted on Beach Drive

and considered significant by the court in Cope are posted in the same area

along the Trail.  Hayes Declaration,  ¶ 4, Exhibits B-1 through B-18, B-25 through

B-31, B-33 and B-34, B-36 through B-41).

    As in Cope, the government here concedes that National Park Service

policy as set forth in the National Park Service Sign Manual is to follow the

Manual on Uniform Traffic Control Devices ("MUTCD") (published by the Federal

Highway Administration, U.S. Department of Transportation) when posting signs.

---

the text, infra, however, the more critical fact is that the sign clearly does not
function as a warning sign.
[7] Bowman v. United States, supra (note 2).

Coleman Decl. ¶¶ 11 – 12.  And as in <u>Cope</u>, the government, through the

Coleman declaration, seeks to avoid the clear instructions in the manuals

requiring a warning sign to have been posted at all times when the Zoo gate was

closed across the trail by invoking the manuals as for "guidance" only.  Coleman

Decl. ¶¶ 11 – 13.[8]  The NPS Sign Manual, however, states that because park

roads "are not intended to provide fast and convenient transportation, nor

designed or intended to serve as commuter routes . . . ," the manuals are to be

used as "guidance."  Dionne Decl., ¶ 13, Exhibit B, p. 1 – 1.  The NPS has

specifically acknowledged that the area in question is a "limited access facility

that currently serves as a primary urban commuter route" for fast, convenient

transportation in the center of a metropolitan area for as many as 60,000 vehicles

per day.  Dionne Decl., ¶ 14.  Thus, the NPS acknowledges that the principal

reason for treating the manuals as "guidance only" documents simply does not

apply in this area.  Therefore, the National Park Service was obligated to adhere

to its own directive in the NPS Sign manual stating that "[w]henever there is a

hazard that might reasonably be expected to result in injury to Service personnel

or the visiting public, signs warning of the hazard must be installed."  Dionne

Decl., ¶ 15, Exhibit B, p. 4 – 4.  The effort to pretend otherwise by invoking non-

applicable public policy factors[9] or simply reiterating that it was the government

---

[8] On behalf of the National Zoo, Mr. Hilton goes a step further and simply
declares that the Zoo has full discretion in the matter of signs, develops whatever
signs it deems necessary, and has adopted no formal standards for sign
placement.  Hilton Decl., ¶¶ 4 – 6.
[9] In a rhetorical flourish, the government even claims that "[T]he [Rock Creek
Park] Trail's aesthetic importance is akin to the Grand Canyon's Rim Drive or the
Shenandoah's Skyline Drive.  Def.'s Memorandum, p. 18.

agency's "policy" to believe it had discretion in the matter is not sufficient to defeat FTCA liability on these facts.  As the Court noted in Cope, even conceding that the MUTCD is more a guide book than a specific prescription for the posting of signs, any discretion left to the government in the matter does not rise to the level of governmental policy decision making.  United States v. Cope, supra, 45 F.3d at 451 – 52.

The government's failure to post a warning sign for trail users, particularly bicycle riders, when it chose to close the gate just beyond a curve in the trail, thus creating a total, sudden obstruction of the pathway, was negligent and violated specific standards for management of a multiuse pathway.  Dionne Decl., ¶¶ 3 – 6, 13 – 16.  The signage requirement would have been easily, inexpensively (perhaps $250.00),[10] and safely met without implicating any of the governmental policy considerations which might otherwise have protected it from liability in this matter.  Under the circumstances, the "discretionary function" exemption provides no safe harbor for the government's negligence.  As this court noted in another National Park Service bike trail safety case, Beckford v. United States, 950 F. Supp. 4, 8 (D.D.C. 1997) (Sporkin, J.), the government's argument that its manuals setting specific standards for routine safety issues are written in precatory language and therefore are for guidance only "does not provide a justification for the government to fail to correct known 'booby traps.'"

In Beckford, the government invoked the discretionary function exemption to defend its decision not to paint with a bright color and reflectorize a bollard

---

[10] Dionne Decl., ¶ 16, and Exhibit E thereto, p. 206, line 7 – p. 207, line 1.

13

stuck in the middle of a brick path frequently used by bicyclists near the Rock

Creek Parkway leading into the C&O Canal National Historic Park. 950 F. Supp.

at 6 – 7. Instead, the Park Service had painted the bollard "National Park

Service brown." 950 F. Supp. at 7. A bicyclist struck the bollard while riding at

10:30 p.m. on a June evening. The court noted that the condition should have

been recognized as dangerous, could have been corrected easily and

inexpensively, and was allowed to persist in "a much traveled area adjacent to

the well known, highly populated Georgetown area of Washington, D.C." behind

the popular Four Seasons Hotel – "a heavily traversed area where pedestrians

and bicyclists can be found at all hours, especially during the days and nights of

summer." 950 F. Supp. at 8 – 10. Citing Cope, the court summarily dispatched

the government's discretionary function defense:

> The Court finds that the discretionary function
> exemption does not apply in this case. Any decisions
> regarding the maintenance of a brown bollard on the
> C&O Canal National Historic Park could not rise to the
> level of issues so fraught with policy that the
> exemption should apply since the 'nature' of the
> decision did not implicate policy judgment.

Id., 950 F. Supp. at 9 (citation omitted).

So, too, in this case. The defendant's motion should be

denied.

### A.    Locking a gate across a poorly maintained trail without inspecting the trail for safety in doing so is, itself, part of the negligence in failure to warn

Defendant attacks plaintiff's claim of "[f]ailure to inspect and maintain the

property in a reasonable manner" on the grounds that plaintiff failed to exhaust

the administrative remedy.  Def.'s Memorandum, pp. 7 – 10.  Defendant

misconstrues the nature of plaintiff's negligent inspection and maintenance claim.

Plaintiff does not contend that the Park Service had the duty to "repair . . . every

cosmetic crack in the sidewalks and trails" and thus cripple the Park Service's

operating budget.  Coleman Decl., ¶ 8.  To the contrary, plaintiff's contention is

that the defendant, acting through two agencies, closed a gate and created a

hazardous trail obstruction without adequately inspecting the trail to determine

whether the gate closure was a reasonable and safe procedure or whether

further steps needed to be taken, i.e., placement of a warning sign or

implementation of other safety measures.  Had the Park Service and the Zoo

exercised appropriate care in making that decision, they would have realized that

a significant factor in deciding whether warning had to be given was an

inspection of the trail, itself, providing knowledge of the condition of the trail

which can affect a trail user's ability to perceive or react to conditions further

along the trail.  Dionne Decl.,  ¶ 16, Exhibit E (Deposition Transcript, p. 198, line

5 – p. 199, line 1); Hayes Decl., ¶¶ 4 – 9.  Once defendant decided it was

necessary to close the gate, it had the obligation to inspect and maintain the trail

appropriately, even if the maintenance consisted of nothing more than posting

appropriate warning signs or taking other safety measures, such as placing

brightly colored cones across the trail.

Contrary to defendant's argument, the claim for negligent inspection and

maintenance was presented in the administrative claim.  Plaintiff specifically

alleged that the trail curved around the tunnel but there was a "gate across the

15

trail" which "blocked" the trail without markings or warning signs, a condition or conditions defendant had created or tolerated as the owner – maintainer of the trail and gate, and which constituted an improper maintenance of the trail absent appropriate markings or warning signs. It is at least Implicit in the administrative claim that if defendant had made an effort to conduct a reasonable inspection of the property while the closed gate was blocking the path without any warning signs, defendant would have recognized the dangerous condition it had created and, presumably, would have acted to correct it. Failure to do so was both a failure to warn and a failure to properly inspect and maintain the trail. There is no requirement to read the administrative statement with the blinders defendant has so purposefully donned. Defendant's motion to dismiss this portion of plaintiff's claim should also be denied.

Conclusion

For the foregoing reasons, plaintiff respectfully requests that the defendant's motion to dismiss or for summary judgment be denied in its entirety.

Respectfully submitted,

JACKSON & CAMPBELL, P.C.


By: /s/ Nicholas S. McConnell
Nicholas S. McConnell (#167742)
1120 – 20th Street, NW (South Tower)
Washington, DC 20036-3437
(202) 457-1600

Attorneys for Plaintiff
David A. Hayes

<u>Certificate of Service</u>

I hereby certify that a copy of the foregoing Plaintiff's Memorandum of

Points and Authorities in Opposition to Defendant's Motion to Dismiss, or, in the

Alternative, for Summary Judgment, and the accompanying Plaintiff's Response

to Defendant's Statement of Allegedly Undisputed Material Facts and proposed

form of Order, were electronically served, this 7th day of September, 2007, upon:

> Claire M. Whitaker, Esq.
> Assistant United States Attorney
> U.S. Attorney's Office
> 555 4th Street, NW – Civil Division
> Washington, DC  20530
> (202) 514-7137
>
> Attorney for Defendant
>
> Christine Nicholson, Esq.
> Associate General Counsel
> Smithsonian Institution
> Office of the General Counsel
> 1000 Jefferson Drive, SW, Suite 302
> Washington, DC  20560-0012
>
> Of Counsel

>                    /s/ Nicholas S. McConnell
>                    Nicholas S. McConnell

406522v.1

17