COPY

1

```
 1              UNITED STATES DISTRICT COURT
 2              FOR THE DISTRICT OF COLUMBIA
 3
 4  - - - - - - - - - - - - x
 5  DAVID A. HAYES,          :
 6        Plaintiff,         :
 7  vs.                      :   Case No: 05-014212 (PLF)
 8  UNITED STATES OF AMERICA,:
 9        Defendant          :
10  - - - - - - - - - - - - x
11                              Washington, D.C.
12                              December 6, 2006
13
14
15
16  Whereupon,
17                      DAVID G. DIONNE
18  the Witness, called for examination by counsel for the
19  Defendant, pursuant to notice and agreement of counsel as to
20  time and place, at 501 3rd Street, 4th Floor, Washington,
21  D.C., where were present on behalf of the parties:
22
23
24
25
```

FREE STATE REPORTING, INC.
Court Reporting   Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

**HAYES DECLARATION
EX. C**

6

```
 1                    P R O C E E D I N G S
 2                                              (10:54 a.m.)
 3   Whereupon,
 4                        DAVID G. DIONNE
 5   was called as a witness and after having been first duly
 6   sworn, was examined and testified as follows:)
 7                      DIRECT EXAMINATION
 8           BY MS. WHITAKER:
 9       Q   Good morning --
10       A   Good morning.
11       Q   -- Mr. Dionne.  Would you please state your name and
12   address for the record.
13       A   My name is David George Dionne.  I live at 146
14   Sillery Bay Road in Pasadena, Maryland.
15       Q   Okay.
16       A   The zip is 21122.
17       Q   And what is your occupation?
18       A   I'm employed by Anne Arundel County, Department of
19   Recreation and Parks.
20       Q   How long have you been there?
21       A   Twenty-five years.
22       Q   And what do you do?
23       A   I'm the superintendent of trails and greenways for
24   Anne Arundel County.
25       Q   And how long have you been doing that?
```

1    Q    What do you believe was required?
2    A    A warning sign. Well, first, when the gates were
3 closed they should have been properly marked as an end of the
4 roadway condition. They should have had the proper
5 reflectors, proper size and colour of signs that would have
6 made a dark gate against a dark background stand out. And
7 then an additional sign or signs should have been placed and
8 my look at the -- or the geography of the site, I think 100
9 feet out, possibly on the chain link fence, there should have
10 been a warning sign and by MUTCD standards there would have
11 been a 24 by 24 black -- I'm sorry, yellow diamond with black
12 lettering and a black border that said gate closed.
13    Q    And is that part of this end of the roadway
14 requirement?
15    A    No, that's a separate requirement.
16    Q    What is that requirement?
17    A    That's a warning sign. Warning signs give the user
18 of the trail, the traveler on the trail, an advance notice
19 that something -- there's a condition ahead that they're going
20 to have to deal with and it's handled in a separate area of
21 the manual, the uniform traffic control devices.
22    Q    Okay. Let's -- what, what section of that is the --
23    A    I'll have to -- where is my copy of the manual? Oh,
24 I believe it's out being copied.
25    Q    Oh, okay. Well, then, we'll go back to that.

| | | |
|---|---|---|
| 1 | A | All right. |
| 2 | Q | Remember it, that we'll go back to that. |
| 3 | A | We'll go back to that. |
| 4 | Q | So that has to do with warnings. And what about the |
| 5 | | end of the road -- |
| 6 | A | The end of the roadway condition is when they |
| 7 | | barricaded a road and they do this on bike trails or for |
| 8 | | whatever reason, if the road is closed, the barrier, the -- |
| 9 | Q | Okay. |
| 10 | A | -- the barricade has got to be marked. |
| 11 | Q | Okay. So you're saying that this end of the roadway |
| 12 | | requirement is both for roads and for bicycles? |
| 13 | A | Correct. |
| 14 | Q | And what do you base that on? What, what -- |
| 15 | A | On the manual uniform traffic devices. |
| 16 | Q | And is that also being copied now? |
| 17 | A | Yes. |
| 18 | Q | Okay. So we'll go back to those two issues. Okay. |
| 19 | | All right. Do you have a policy in Anne Arundel County to try |
| 20 | | to minimally intrude upon the natural and historic setting in, |
| 21 | | in, in the park with regard to signs? |
| 22 | A | Yes, we try to keep signs -- we try to have the |
| 23 | | required signs but we try not to over sign the park. |
| 24 | Q | Okay. |
| 25 | A | It's not a policy. It's more of a guideline. |

```
 1            BY MR. McCONNELL:
 2       Q    Let's go back several hours, Mr. Dionne.  You were
 3  asked a number of questions with respect to the ability of
 4  certain people within the federal government to have a
 5  discretionary function with respect to safety issues related
 6  to bicycle trail management, and specifically you were asked
 7  those questions in connection with a document marked as your
 8  Exhibit Number 2 of the National Park Service Sign Manual.
 9  Let me take you to Section -- page 4-4 of your Exhibit 2.
10            MS. WHITAKER:  In what section is that?
11            MR. McCONNELL:  It's Chapter 4.
12            MS. WHITAKER:  -- my original back on that one.  I'm
13  sorry to say, Mr. O'Connell (sic), is that part of the
14  documents that we've already introduced?
15            MR. McCONNELL:  Yes, Exhibit 2.
16            MS. WHITAKER:  Exhibit 2.
17            MR. McCONNELL:  It's the big --
18            MS. WHITAKER:  Let me just see.  It's the sign
19  manual?
20            MR. McCONNELL:  Yes.
21            MS. WHITAKER:  It's the sign manual?
22            MR. McCONNELL:  Yes, National Park Service Sign
23  Manual, and we're looking at page 4-4 --
24            MS. WHITAKER:  Okay.
25            MR. McCONNELL:  -- in Chapter 4.
```

1            MS. WHITAKER:  Okay.
2            BY MR. McCONNELL:
3       Q    This part wasn't read to you earlier so I will
4  direct your attention to this and then ask you some questions.
5  At page 4-4, about two-thirds of the way down there's a
6  paragraph Safety Signs.  Follow along with me if you would,
7  Mr. Dionne.
8            "Whenever there is a hazard that might reasonably be
9  expected to result in injury to service personnel or the
10 visiting public, signs warning of
11 the hazard must be installed."  Have I read that correctly?
12      A    Yes, you have.
13      Q    In your opinion does -- did the drawing of the gates
14 across this bike path create a hazard as that word is used at
15 this section of the manual?
16      A    Yes, it did.
17      Q    As you read this manual and as you understand the
18 standard of care prevailing in the bike path management
19 profession, is there discretion with respect to posting safety
20 signs under circumstances where there is a hazard that might
21 reasonably be expected?  Is there any discretion with respect
22 to posting safety signs in those conditions?
23      A    No, there's not.
24      Q    And the safety signs that are to be posted, are they
25 identified and defined?

1  A   Yes, they are.
2  Q   And among the signs that are required to be used
3  where a hazard exists, do the standards recognized within your
4  profession, the industry, the bike trail industry, refer back
5  to the safety standards and what I think we've been calling
6  the Manual of Uniform Traffic Safety --
7  A   Traffic Control Devices.
8  Q   Traffic Control Devices.
9  A   Yes, they do.
10 Q   All right.  And under those standards, in your
11 opinion to a reasonable degree of certainty within your
12 profession, assuming the gate was pulled closed across this
13 trail at the place depicted in your photographs in this case
14 that we've seen, did that create a hazard?
15 A   Yes, it did.
16 Q   And under the applicable standards, in your opinion
17 to a reasonable professional certainty, once those gates were
18 closed, did that also require that the person closing the
19 gates to take into account the standards with respect to
20 safety?
21 A   Yes, it does.
22 Q   All right.  Upon the closing of the gate, what
23 standards then was the person who was closing the
24 gate required to observe?
25 A   He is required to sufficiently mark the gate and

```
 1  provide adequate advanced warning to people who would be
 2  approaching the gate.
 3       Q    All right.  Now, in this case there may be some
 4  question among the defendants as to whether it was in fact the
 5  National Zoo or the Smithsonian Institution or the U.S. Park
 6  Service that actually physically closed the gate.  From a
 7  public safety point of view does it make any difference who's
 8  actually closing the gate?
 9       A    No, not at all.
10       Q    All right.  I would ask you to assume for a moment
11  that the documentation we've been provided suggests that in
12  fact the gate was on National Zoo property and was closed by
13  National Zoo personnel.  If that were the case, do your same
14  findings in the report apply for the National Zoo personnel?
15       A    Yes.
16       Q    Did the standard of care, national standard of care
17  for the operation and maintenance of a bike trail in December
18  of 2003 require, if it were the National Zoo responsible for
19  the closing of this gate, to have in place the various safety
20  considerations that you've identified in your report,
21  including the signage?
22       A    Yes, it does.
23       Q    And is it your opinion to a reasonable professional
24  -- reasonable degree of professional certainty within your
25  area of expertise that if those safety requirements had been
```

1  observed, then this event would not have occurred?
2       A    Yes, that is my opinion.
3            (Pause.)
4            BY MR. McCONNELL:
5       Q    You responded just a moment ago to a question from
6  Ms. Whitaker, that your opinion principly was the failure to
7  post signs was the primary failure in the case.  But even
8  before the issue of posting signs arises, can you tell us, is
9  it the closing of the gate that triggers the safety concern
10 here?
11      A    Yes, it is.
12      Q    And if a person is going to exercise that type of
13 dominion or control over this bike path, that is by creating a
14 barricade across the path, before doing that are they required
15 to take into account the design of the path, the construction
16 of the path, the current condition of the path and all those
17 other items that you have identified in your report in this
18 case?
19      A    Yes, they are.
20      Q    And in your opinion to a reasonable degree of
21 professional certainty, based on all the information you've
22 been provided -- Smithsonian Institution, in closing this gate
23 on December 25, 2003 comply with applicable national
24 recognized standards of care among bike trail management
25 experts for complying with safety standards?

1    A    No, they did not.
2    Q    You also responded just a short while ago to a
3 question from Ms. Whitaker about placement of the sign or
4 signs that would be required to give appropriate or adequate
5 notice under the required minimal standards. What would the
6 minimum standards have required as to appropriate or
7 acceptable signage under these circumstances, in your opinion
8 to a reasonable degree of professional certainty?
9    A    There should have been a sign on the gate that had,
10 I believe, would have reflectors that was a minimum size,
11 probably a 24 by 24, one on each of the two gates and there
12 should have been a 24 by 24 yellow warning sign with black
13 lettering and a black border around the sign that was mounted
14 at a minimum of 50 feet in advance of the gate, and the
15 wording could have said gate closed or bike path closed.
16    Q    There were, there were questions put to you
17 concerning the sign that is identified in your photographs in
18 this case that was present as an informational sign that you
19 had talked about?
20    A    Yes.
21    Q    Does that sign in any way meet the minimum standards
22 required under these circumstances for the person or entity
23 controlling this gate in terms of providing for the safety of
24 the users of that path and particularly bike --
25    A    No.

```
 1            MS. WHITAKER:  Objection.
 2            BY MR. McCONNELL:
 3       Q    Bike users.
 4       A    No, it does not.
 5       Q    And why is that?
 6       A    The sign is the wrong colour.  It's placed in the
 7  wrong location.  It's mounted at the wrong height.  It's not
 8  reflectorized and then it provides no ability to even read the
 9  wording on the sign until you're actually at the gate.
10  There's no advance warning.
11       Q    You anticipated my next question.  Assuming a
12  bicyclist riding at a reasonable rate of speed on this bike
13  path and approaching the only sign that was there, would a
14  bicyclist have been able to read that sign in any way to use
15  it to protect themselves against the closure of that gate?
16       A    No.
17       Q    You were asked when you had visited the site to take
18  your photographs and do your on site investigation whether you
19  noticed the gate end of the Zoo itself of Beach Drive.
20       A    Correct.
21       Q    And you were asked whether you would have expected
22  that to be open on Christmas day, and as I recall your answer
23  you said not necessarily.  You'd in fact expect the Zoo to be
24  closed.
25       A    That's correct.
```

1  Q   Based on your knowledge and expertise in bike trail
2  management and safety, would a bicyclist riding around this
3  particular trail on Christmas day expect that trail to be
4  suddenly blocked or closed at any point?
5  A   I don't believe so.
6  Q   You were asked about sources of knowledge that you
7  may bring to bear in this case.  You told us, very early in
8  your deposition briefly about your experience and your
9  employment history.  As someone who spent this much time in
10 bicycle trail design, management and safety issues, are there
11 general materials out there that you use daily in your
12 practice that inform you as to what the community standards
13 and national standards are?
14 A   Yes.
15 Q   Do you attend national conferences related to issues
16 like this?
17 A   Yes, I do.
18 Q   Do you have frequent occasion to telephone or talk
19 with colleagues from around the country on issues related to
20 bicycle trail design, safety and maintenance?
21 A   Yes, sometimes two to three times a week.
22 Q   And through that are you familiar with the
23 applicable national standard of care good and accepted
24 practices as of December 2003 in terms of the appropriate
25 design, maintenance, management and safety of bicycle trails

1  in the United States?
2      A    Yes.
3      Q    And are those the standards that you have
4  incorporated in your report in this case and testified to here
5  today?
6      A    Yes, they are.
7      Q    We had picked up earlier and I think
8  Ms. Whitaker had discussed with you the correction in your
9  report on the date of this particular event in your report, it
10 refers several times to December 25, 2004.  Let me ask you to
11 assume that I think we all agree that what we're really
12 talking about is December 25, 2003.  Does that change in date
13 in any way affect any of your other opinions or testimony in
14 this case?
15     A    No, it doesn't.
16     Q    In the discussion of the placement of various safety
17 signs there were several documents where there were references
18 to needing an engineering study as a basis for the placement
19 of a safety or warning sign.  Do you recall those references?
20     A    Yes, I do.
21     Q    Based on your review of this specific site and
22 including your visit to the site and your knowledge, training
23 and experience in the field of appropriate design, management
24 administration, maintenance and safety of bike trails, did the
25 situation existing at this site with respect to closing of the

1  gate require an engineering study to be done before the
2  requirements for signage could be deemed in place or
3  effective?
4      A    No.
5           MS. WHITAKER:  Objection.  I'm sorry.  I had someone
6  come in at the time.  Do you mind repeating that question?  I
7  mean, he's already answered it.  I suppose I can read it but
8  --
9           MR. McCONNELL:  I can try.
10          MS. WHITAKER:  That's okay.  I can have her read.
11 Are you going to follow up with another question?
12          MR. McCONNELL:  I can try to repeat the question.
13          MS. WHITAKER:  All right.
14          BY MR. McCONNELL:
15     Q    Earlier in your deposition there were several places
16 where you were referred to documents that said before safety
17 signs needed to be placed there was a requirement that
18 engineering studies be done as a basis for the decisions
19 related to placement of the sign.  Based on your own knowledge
20 related to this specific site derived from your visit to the
21 site and all the other information you've been provided and
22 applying December 2003 national standards of practice for
23 appropriate maintenance, management administration, safety of
24 bicycle trails, did this specific site require that an
25 engineering study be performed before the minimum requirements

```
 1  about placing safety signs and warnings became effective?
 2       A    No.
 3       Q    Would anyone with or without a specific engineering
 4  degree or background, looking at this site who is
 5  knowledgeable about bicycle trail maintenance, safety,
 6  administration and management have understood as of December
 7  2003 that before closing a gate across this path at this
 8  specific site and this specific gate, they needed to implement
 9  the various safety standards including the signage standards
10  you've referred to today?
11       A    Yes.
12            MS. WHITAKER:  Objection.  Give me a chance to at
13  least put my objection on.
14            (Pause.)
15            BY MR. McCONNELL:
16       Q    Was the placement of safety signs to warn users that
17  the gate had been closed, a matter that was the matter of any
18  form of discretion?
19       A    No.
20            MS. WHITAKER:  Objection to the question.
21            THE WITNESS:  I'm sorry, do I need to --
22            MS. WHITAKER:  No, you're --
23            MR. McCONNELL:  She's objecting to the question.
24  You're free to answer.
25            (Pause.)
```

1       BY MR. McCONNELL:
2    Q    There were questions directed to you as to whether
3  in fact the manual we've been referring to, UMTCD (sic),
4  actually -- the closing of these gates as an end of roadway
5  condition?  Was it commonly understood within the bicycle
6  trail management profession as of December 2003, that placing
7  a gate totally across a bike path in effect created and end of
8  trail condition?
9       MS. WHITAKER:  Objection.
10      THE WITNESS:  Yes.
11      BY MR. McCONNELL:
12   Q    And where an end of trail condition has been
13 created, in your opinion to a reasonable professional
14 certainty within your expertise, as of December 2003, when
15 someone takes action creating an end of trail condition, were
16 they required to comply with the safety requirements
17 concerning -- for such a condition?
18      MS. WHITAKER:  Objection.  End of trail?  Objection
19 to the form of the question and also to the characterization
20 of the provision.
21      MR. McCONNELL:  All right, okay.
22      BY MR. McCONNELL:
23   Q    Let me change, change the question to say either end
24 of trail or end of roadway, were they required to comply then
25 with the minimum signage and safety standards that you have

```
 1  described?
 2      A    No.
 3           MS. WHITAKER:  Objection.  You can answer.
 4           THE WITNESS:  Thank you.  Yes, they were required to
 5  comply.
 6           BY MR. McCONNELL:
 7      Q    In your opinion to a reasonable degree of
 8  professional certainty within your field of expertise and
 9  having looked at this site, did the requirement to post the
10  warning signs that you've described as being the minimum
11  acceptable standard require the highest degree of skill care
12  and knowledge within the bicycle maintenance and path safety
13  industry or was this something that anybody of reasonable
14  ordinary competence and ability would have understood as
15  required?
16           MS. WHITAKER:  Objection.  You may answer.
17           THE WITNESS:  I may answer?  Anyone, anyone could
18  have mounted these signs.  It would have been very easy to
19  produce, very easy to mount, very easy to modify if it needed
20  to be modified.
21           BY MR. McCONNELL:
22      Q    How expensive are these signs?
23      A    The signs that I'm talking about probably would cost
24  $50 to $60 each, two for each gate and then the one advanced
25  warning sign, so we're talking less than $250, with mounting
```

1  brackets.
2      Q    Thank you.
3          MR. McCONNELL:  I have no other questions at this
4  time.
5          MS. WHITAKER:  All right.
6                    REDIRECT EXAMINATION
7      BY MS. WHITAKER:
8      Q    This is the last exhibit.  Here is your document
9  back.
10     A    Thank you very much.
11         (Dionne Deposition Exhibit Number 18 marked for
12 identification.)
13     BY MS. WHITAKER:
14     Q    This is called a Case Study Number 8, and if you
15 could possibly identify it and indicate what the date is and
16 if you -- and how -- if you relied on it now.
17     A    This is Case Study Number 8, publication of the U.S.
18 Department of Transportation, the Federal Highway
19 Administration -- the National Biking and Walking Study.  It's
20 subtitled Organizing citizen Support and Acquiring Funding for
21 Bicycle and Pedestrian trails.  It was produced in April of
22 1993, and I did not rely on this in forming my opinion.  I
23 have reviewed it and learned quite a bit about the, the
24 various case studies and information that was provided, but it
25 was not used in the preparation of my report.