194

   1        BY MR. McCONNELL:

   2   Q   Let's go back several hours, Mr. Dionne.  You were

   3  asked a number of questions with respect to the ability of

   4  certain people within the federal government to have a

   5  discretionary function with respect to safety issues related

   6  to bicycle trail management, and specifically you were asked

   7  those questions in connection with a document marked as your

   8  Exhibit Number 2 of the National Park Service Sign Manual.

   9  Let me take you to Section -- page 4-4 of your Exhibit 2.

  10        MS. WHITAKER:  In what section is that?

  11        MR. McCONNELL:  It's Chapter 4.

  12        MS. WHITAKER:  -- my original back on that one.  I'm

  13  sorry to say, Mr. O'Connell (sic), is that part of the

  14  documents that we've already introduced?

  15        MR. McCONNELL:  Yes, Exhibit 2.

  16        MS. WHITAKER:  Exhibit 2.

  17        MR. McCONNELL:  It's the big --

  18        MS. WHITAKER:  Let me just see.  It's the sign

  19  manual?

  20        MR. McCONNELL:  Yes.

  21        MS. WHITAKER:  It's the sign manual?

  22        MR. McCONNELL:  Yes, National Park Service Sign

  23  Manual, and we're looking at page 4-4 --

  24        MS. WHITAKER:  Okay.

  25        MR. McCONNELL:  -- in Chapter 4.

FREE STATE REPORTING, INC.
Court Reporting   Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

**DIONNE DECLARATION**
**EX. E**

1           MS. WHITAKER: Okay.
2           BY MR. McCONNELL:
3      Q    This part wasn't read to you earlier so I will
4  direct your attention to this and then ask you some questions.
5  At page 4-4, about two-thirds of the way down there's a
6  paragraph Safety Signs. Follow along with me if you would,
7  Mr. Dionne.
8           "Whenever there is a hazard that might reasonably be
9  expected to result in injury to service personnel or the
10 visiting public, signs warning of
11 the hazard must be installed." Have I read that correctly?
12     A    Yes, you have.
13     Q    In your opinion does -- did the drawing of the gates
14 across this bike path create a hazard as that word is used at
15 this section of the manual?
16     A    Yes, it did.
17     Q    As you read this manual and as you understand the
18 standard of care prevailing in the bike path management
19 profession, is there discretion with respect to posting safety
20 signs under circumstances where there is a hazard that might
21 reasonably be expected? Is there any discretion with respect
22 to posting safety signs in those conditions?
23     A    No, there's not.
24     Q    And the safety signs that are to be posted, are they
25 identified and defined?

1    A    Yes, they are.

2    Q    And among the signs that are required to be used
3  where a hazard exists, do the standards recognized within your
4  profession, the industry, the bike trail industry, refer back
5  to the safety standards and what I think we've been calling
6  the Manual of Uniform Traffic Safety --

7    A    Traffic Control Devices.

8    Q    Traffic Control Devices.

9    A    Yes, they do.

10   Q    All right.  And under those standards, in your
11 opinion to a reasonable degree of certainty within your
12 profession, assuming the gate was pulled closed across this
13 trail at the place depicted in your photographs in this case
14 that we've seen, did that create a hazard?

15   A    Yes, it did.

16   Q    And under the applicable standards, in your opinion
17 to a reasonable professional certainty, once those gates were
18 closed, did that also require that the person closing the
19 gates to take into account the standards with respect to
20 safety?

21   A    Yes, it does.

22   Q    All right.  Upon the closing of the gate, what
23 standards then was the person who was closing the
24 gate required to observe?

25   A    He is required to sufficiently mark the gate and

1  provide adequate advanced warning to people who would be
2  approaching the gate.
3      Q   All right.  Now, in this case there may be some
4  question among the defendants as to whether it was in fact the
5  National Zoo or the Smithsonian Institution or the U.S. Park
6  Service that actually physically closed the gate.  From a
7  public safety point of view does it make any difference who's
8  actually closing the gate?
9      A   No, not at all.
10     Q   All right.  I would ask you to assume for a moment
11 that the documentation we've been provided suggests that in
12 fact the gate was on National Zoo property and was closed by
13 National Zoo personnel.  If that were the case, do your same
14 findings in the report apply for the National Zoo personnel?
15     A   Yes.
16     Q   Did the standard of care, national standard of care
17 for the operation and maintenance of a bike trail in December
18 of 2003 require, if it were the National Zoo responsible for
19 the closing of this gate, to have in place the various safety
20 considerations that you've identified in your report,
21 including the signage?
22     A   Yes, it does.
23     Q   And is it your opinion to a reasonable professional
24 -- reasonable degree of professional certainty within your
25 area of expertise that if those safety requirements had been

Case 1:05-cv-01421-PLF    Document 24-54    Filed 09/07/2007    Page 5 of 14

198

```
 1  observed, then this event would not have occurred?
 2       A    Yes, that is my opinion.
 3            (Pause.)
 4            BY MR. McCONNELL:
 5       Q    You responded just a moment ago to a question from
 6  Ms. Whitaker, that your opinion principly was the failure to
 7  post signs was the primary failure in the case.  But even
 8  before the issue of posting signs arises, can you tell us, is
 9  it the closing of the gate that triggers the safety concern
10  here?
11       A    Yes, it is.
12       Q    And if a person is going to exercise that type of
13  dominion or control over this bike path, that is by creating a
14  barricade across the path, before doing that are they required
15  to take into account the design of the path, the construction
16  of the path, the current condition of the path and all those
17  other items that you have identified in your report in this
18  case?
19       A    Yes, they are.
20       Q    And in your opinion to a reasonable degree of
21  professional certainty, based on all the information you've
22  been provided -- Smithsonian Institution, in closing this gate
23  on December 25, 2003 comply with applicable national
24  recognized standards of care among bike trail management
25  experts for complying with safety standards?
```

FREE STATE REPORTING, INC.
Court Reporting    Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

```
 1    A    No, they did not.
 2    Q    You also responded just a short while ago to a
 3  question from Ms. Whitaker about placement of the sign or
 4  signs that would be required to give appropriate or adequate
 5  notice under the required minimal standards.  What would the
 6  minimum standards have required as to appropriate or
 7  acceptable signage under these circumstances, in your opinion
 8  to a reasonable degree of professional certainty?
 9    A    There should have been a sign on the gate that had,
10  I believe, would have reflectors that was a minimum size,
11  probably a 24 by 24, one on each of the two gates and there
12  should have been a 24 by 24 yellow warning sign with black
13  lettering and a black border around the sign that was mounted
14  at a minimum of 50 feet in advance of the gate, and the
15  wording could have said gate closed or bike path closed.
16    Q    There were, there were questions put to you
17  concerning the sign that is identified in your photographs in
18  this case that was present as an informational sign that you
19  had talked about?
20    A    Yes.
21    Q    Does that sign in any way meet the minimum standards
22  required under these circumstances for the person or entity
23  controlling this gate in terms of providing for the safety of
24  the users of that path and particularly bike --
25    A    No.
```

```
 1              MS. WHITAKER:  Objection.
 2              BY MR. McCONNELL:
 3        Q     Bike users.
 4        A     No, it does not.
 5        Q     And why is that?
 6        A     The sign is the wrong colour.  It's placed in the
 7   wrong location.  It's mounted at the wrong height.  It's not
 8   reflectorized and then it provides no ability to even read the
 9   wording on the sign until you're actually at the gate.
10   There's no advance warning.
11        Q     You anticipated my next question.  Assuming a
12   bicyclist riding at a reasonable rate of speed on this bike
13   path and approaching the only sign that was there, would a
14   bicyclist have been able to read that sign in any way to use
15   it to protect themselves against the closure of that gate?
16        A     No.
17        Q     You were asked when you had visited the site to take
18   your photographs and do your on site investigation whether you
19   noticed the gate end of the Zoo itself of Beach Drive.
20        A     Correct.
21        Q     And you were asked whether you would have expected
22   that to be open on Christmas day, and as I recall your answer
23   you said not necessarily.  You'd in fact expect the Zoo to be
24   closed.
25        A     That's correct.
```

```
 1      Q    Based on your knowledge and expertise in bike trail
 2 management and safety, would a bicyclist riding around this
 3 particular trail on Christmas day expect that trail to be
 4 suddenly blocked or closed at any point?
 5      A    I don't believe so.
 6      Q    You were asked about sources of knowledge that you
 7 may bring to bear in this case.  You told us, very early in
 8 your deposition briefly about your experience and your
 9 employment history.  As someone who spent this much time in
10 bicycle trail design, management and safety issues, are there
11 general materials out there that you use daily in your
12 practice that inform you as to what the community standards
13 and national standards are?
14      A    Yes.
15      Q    Do you attend national conferences related to issues
16 like this?
17      A    Yes, I do.
18      Q    Do you have frequent occasion to telephone or talk
19 with colleagues from around the country on issues related to
20 bicycle trail design, safety and maintenance?
21      A    Yes, sometimes two to three times a week.
22      Q    And through that are you familiar with the
23 applicable national standard of care good and accepted
24 practices as of December 2003 in terms of the appropriate
25 design, maintenance, management and safety of bicycle trails
```

Case 1:05-cv-01421-PLF    Document 24-54    Filed 09/07/2007    Page 9 of 14

202

1  in the United States?

2     A    Yes.

3     Q    And are those the standards that you have
4  incorporated in your report in this case and testified to here
5  today?

6     A    Yes, they are.

7     Q    We had picked up earlier and I think
8  Ms. Whitaker had discussed with you the correction in your
9  report on the date of this particular event in your report, it
10 refers several times to December 25, 2004.  Let me ask you to
11 assume that I think we all agree that what we're really
12 talking about is December 25, 2003.  Does that change in date
13 in any way affect any of your other opinions or testimony in
14 this case?

15    A    No, it doesn't.

16    Q    In the discussion of the placement of various safety
17 signs there were several documents where there were references
18 to needing an engineering study as a basis for the placement
19 of a safety or warning sign.  Do you recall those references?

20    A    Yes, I do.

21    Q    Based on your review of this specific site and
22 including your visit to the site and your knowledge, training
23 and experience in the field of appropriate design, management
24 administration, maintenance and safety of bike trails, did the
25 situation existing at this site with respect to closing of the

FREE STATE REPORTING, INC.
Court Reporting    Depositions
D.C. Area (301) 261-1902
Balt. & Annap. (410) 974-0947

```
 1  gate require an engineering study to be done before the
 2  requirements for signage could be deemed in place or
 3  effective?
 4       A    No.
 5            MS. WHITAKER:  Objection.  I'm sorry.  I had someone
 6  come in at the time.  Do you mind repeating that question?  I
 7  mean, he's already answered it.  I suppose I can read it but
 8  --
 9            MR. McCONNELL:  I can try.
10            MS. WHITAKER:  That's okay.  I can have her read.
11  Are you going to follow up with another question?
12            MR. McCONNELL:  I can try to repeat the question.
13            MS. WHITAKER:  All right.
14            BY MR. McCONNELL:
15       Q    Earlier in your deposition there were several places
16  where you were referred to documents that said before safety
17  signs needed to be placed there was a requirement that
18  engineering studies be done as a basis for the decisions
19  related to placement of the sign.  Based on your own knowledge
20  related to this specific site derived from your visit to the
21  site and all the other information you've been provided and
22  applying December 2003 national standards of practice for
23  appropriate maintenance, management administration, safety of
24  bicycle trails, did this specific site require that an
25  engineering study be performed before the minimum requirements
```

1  about placing safety signs and warnings became effective?
2      A    No.
3      Q    Would anyone with or without a specific engineering
4  degree or background, looking at this site who is
5  knowledgeable about bicycle trail maintenance, safety,
6  administration and management have understood as of December
7  2003 that before closing a gate across this path at this
8  specific site and this specific gate, they needed to implement
9  the various safety standards including the signage standards
10 you've referred to today?
11     A    Yes.
12         MS. WHITAKER:  Objection.  Give me a chance to at
13 least put my objection on.
14         (Pause.)
15         BY MR. McCONNELL:
16     Q    Was the placement of safety signs to warn users that
17 the gate had been closed, a matter that was the matter of any
18 form of discretion?
19     A    No.
20         MS. WHITAKER:  Objection to the question.
21         THE WITNESS:  I'm sorry, do I need to --
22         MS. WHITAKER:  No, you're --
23         MR. McCONNELL:  She's objecting to the question.
24 You're free to answer.
25         (Pause.)

1    BY MR. McCONNELL:

2    Q    There were questions directed to you as to whether
3 in fact the manual we've been referring to, UMTCD (sic),
4 actually -- the closing of these gates as an end of roadway
5 condition?  Was it commonly understood within the bicycle
6 trail management profession as of December 2003, that placing
7 a gate totally across a bike path in effect created and end of
8 trail condition?

9    MS. WHITAKER:  Objection.

10    THE WITNESS:  Yes.

11    BY MR. McCONNELL:

12    Q    And where an end of trail condition has been
13 created, in your opinion to a reasonable professional
14 certainty within your expertise, as of December 2003, when
15 someone takes action creating an end of trail condition, were
16 they required to comply with the safety requirements
17 concerning -- for such a condition?

18    MS. WHITAKER:  Objection.  End of trail?  Objection
19 to the form of the question and also to the characterization
20 of the provision.

21    MR. McCONNELL:  All right, okay.

22    BY MR. McCONNELL:

23    Q    Let me change, change the question to say either end
24 of trail or end of roadway, were they required to comply then
25 with the minimum signage and safety standards that you have

1  described?

2     A    No.

3          MS. WHITAKER:  Objection.  You can answer.

4          THE WITNESS:  Thank you.  Yes, they were required to

5  comply.

6          BY MR. McCONNELL:

7     Q    In your opinion to a reasonable degree of

8  professional certainty within your field of expertise and

9  having looked at this site, did the requirement to post the

10 warning signs that you've described as being the minimum

11 acceptable standard require the highest degree of skill care

12 and knowledge within the bicycle maintenance and path safety

13 industry or was this something that anybody of reasonable

14 ordinary competence and ability would have understood as

15 required?

16         MS. WHITAKER:  Objection.  You may answer.

17         THE WITNESS:  I may answer?  Anyone, anyone could

18 have mounted these signs.  It would have been very easy to

19 produce, very easy to mount, very easy to modify if it needed

20 to be modified.

21         BY MR. McCONNELL:

22    Q    How expensive are these signs?

23    A    The signs that I'm talking about probably would cost

24 $50 to $60 each, two for each gate and then the one advanced

25 warning sign, so we're talking less than $250, with mounting

```
 1  brackets.
 2      Q    Thank you.
 3           MR. McCONNELL:  I have no other questions at this
 4  time.
 5           MS. WHITAKER:  All right.
 6                     REDIRECT EXAMINATION
 7      BY MS. WHITAKER:
 8      Q    This is the last exhibit.  Here is your document
 9  back.
10      A    Thank you very much.
11           (Dionne Deposition Exhibit Number 18 marked for
12  identification.)
13      BY MS. WHITAKER:
14      Q    This is called a Case Study Number 8, and if you
15  could possibly identify it and indicate what the date is and
16  if you -- and how -- if you relied on it now.
17      A    This is Case Study Number 8, publication of the U.S.
18  Department of Transportation, the Federal Highway
19  Administration -- the National Biking and Walking Study.  It's
20  subtitled Organizing citizen Support and Acquiring Funding for
21  Bicycle and Pedestrian trails.  It was produced in April of
22  1993, and I did not rely on this in forming my opinion.  I
23  have reviewed it and learned quite a bit about the, the
24  various case studies and information that was provided, but it
25  was not used in the preparation of my report.
```